IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **FRAMETECH LLC,** <br><br> Plaintiff, <br><br> v. <br><br> **MICRO FOCUS LLC,** <br><br> Defendant. | Case No. 4:23-cv-02572 <br><br><br> The Honorable Judge George C. Hanks, Jr. |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO 35 U.S.C. § 101**

Plaintiff FrameTech LLC ("Plaintiff" or "FrameTech") hereby files this Response in Opposition to Micro Focus LLC's ("Defendant" or "Micro Focus") Motion to Dismiss ("Motion") Plaintiff's First Amended Complaint ("FAC").

I.   **INTRODUCTION**

In its Motion, Micro Focus oversimplifies the claims of the U.S. Patent No. 7,194,737 ("the '737 Patent"), misstates the law of patent eligibility, and improperly attempts to dispute the factual allegations of Plaintiff's FAC, which must be taken as true in this posture.

As an initial matter, the Motion is premature. Micro Focus's argument turns on disputed issues of fact involving whether the '737 Patent claims inventive concepts, and extent to which its claimed methods differ from conventional methods of upgrading mainframe operating systems. While Micro Focus tries, time and again, to boil down the invention of the '737 Patent to mere "automation," the claims are not so limited. As the '737 Patent and the allegations of Plaintiff FAC make clear, the claimed method does more than merely "automate" a process previously performed by human beings. Moreover, to the extent that automation is involved in

1

the claimed method, that is no bar to patent-eligibility. Contrary to Micro Focus's version of the law of patent eligibility, patents involving automation have frequently been found patent-eligible. As the Federal Circuit recently stated, "[a]utomation of a manual process may ***not*** be an abstract idea if the automated process differs from the manual process and provides a specific means or method that improves the relevant technology." *People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794, at *8 (Fed. Cir. Apr. 7, 2023) (emphasis added).

As alleged in Plaintiff's FAC, the '737 Patent claims an unconventional distributed architecture that addresses a specific technical problem—the risk of error—employing a client computer to test and customize a base operating system before installation on the mainframe. D.I. 28 at ¶¶ 11-30. According to Micro Focus, however, the '737 Patent somehow "precludes any allegation that the claims do not merely computerize a process performed by humans." D.I. 33 at 13. But, in fact, the '737 Patent explicitly contrasts the claimed methods with the process previously performed by human programmers. As the '737 Patent explains, "***[a]bsent*** the steps and processes described herein, a skilled mainframe computer systems programmer is required to enable a mainframe computer system 2, using ***just*** the base operating system, to successfully IPL the mainframe computer system." D.I. 28-1 at 5:12-15 (emphasis added).

Thus, according to the '737 Patent itself, the claimed methods use more than "just" the "base operating system." *Id*. Without the specific method of Claim 1 of the '737 Patent, and the client computer used therein, the human programmer would be forced to rely solely on the "base operating system" to upgrade the mainframe. As Plaintiff alleges in its FAC, the process performed by human beings, "absent" the specific method of Claim 1, exposed the mainframe to a significant "risk of error," "frequently resulting in faulty installations that slowed down mainframe computer functioning." D.I. 28 at ¶¶ 15-16. The method of Claim 1 addressed precisely this, employing a "client computer to test the functionality of the operating system, make necessary improvements, and resolve errors before such a system was fully loaded onto the mainframe computer system." *Id*. ¶ 22.

Micro Focus ignores all this, and attempts to contravene the allegations of Plaintiff's FAC, which obviously "must be accepted as true and construed in the light most favorable to the nonmoving party. "*Avila v. Mortg. Elec. Registration Sys., Inc*., No. 4:12-CV-830, 2012 WL 6055298, at *2 (S.D. Tex. Dec. 5, 2012). Micro Focus's repeated refrain is that the '737 Patent merely automates a manual process and does nothing else, in spite of the fact that the '737 Patent draws a clear distinction between the nature of the "steps and processes" it claims, and the manual process performed by human programmers prior to the invention. D.I. 28-1 at 5:12-15; D.I. 28 at ¶¶ 11-30. To be sure, Plaintiff does not deny that the claimed method involves **some** automation; Claim 1 uses the term "automatically" in one of its limitations, though not all. Contrary to Defendant's version of the law, however, that in itself is not fatal to the '737 Patent's eligibility. The method of Claim 1 "differs from the manual process" previously employed by human beings "and provides a specific means or method that improves the relevant technology." *People.ai*, 2023 WL 2820794, at *8.

Micro Focus's attempt to embroil the Court in factual disputes at this stage, and its misinterpretation of the '737 Patent, highlight the prematurity of its Motion for another reason. As is well-known, Section 101 jurisprudence is difficult to apply. *See, e.g., Slyce Acquisition Inc. v. Syte - Visual Conception Ltd.*, No. W-19-CV-00257-ADA, 2020 WL 278481, at *6 (W.D. Tex. Jan. 10, 2020) ("*Alice* is a difficult test to apply and yields inconsistent results. This lack of predictability and consistency is widely known and extremely problematic."). Many courts have therefore opted to defer Section 101 determinations until after claim construction and the close of fact discovery, acknowledging that a "court stands a better chance of making the correct § 101 eligibility decision by delaying that decision in order to spend more time understanding the patent[] and its nuances, as well as technology in general, and what was well-understood, routine, and conventional activities previously known to the industry." *Id*. at *7.

Here, where the Markman Hearing in this case is scheduled to be held within six (6) months (see D.I. 32), there is little to be gained by deciding the issue of patent-eligibility at the

pleading stage, when the Court will shortly have a fuller understanding of the '737 Patent and a developed factual record. At that point, the Court will be in a better position to consider how Claim 1 "differs from the manual process" previously employed by human beings, and how the "specific means or method" of the '737 Patent "improves the relevant technology." *People.ai*, 2023 WL 2820794, at *8. For this eminently practical reason, too, the Motion should be denied as premature.

Accordingly, as argued herein, the '737 Patent should be held patent-eligible under Section 101, and Micro Focus's Motion should be denied.

## II.  THE '737 PATENT AND THE ALLEGATIONS OF PLAINTIFF'S FAC

Prior to the invention of the '737 Patent, the "installation and maintenance of mainframe computer operating systems [was] an arduous task." D.I. 28-1, 1:31-33. For example, prior to the invention, "one or more skilled technicians [would] typically expend three to four days to upgrade a mainframe computer operating system." *Id*., at 1:43-44. "Unlike personal computers that automatically 'boot-up' after receiving power (i.e., being turned on), a mainframe IPL is considerably complex and time-consuming." *Id.*, at 1:39-42.

As alleged in Plaintiff's FAC, "[t]he process of installing and maintaining mainframe computer operating systems, as performed prior to the invention, was encumbered by a number of technical difficulties affecting the performance of mainframe computer systems, both during and after installation of operating system upgrades." D.I. 28 at ¶ 13. "For example, mainframes would be bogged down during the time required to upgrade the operating system, preventing their use for other tasks, occupying RAM and resulting in inefficiencies. This represented a significant loss of computing power, given that mainframes are powerful, large-scale computers purpose-built for lengthy or demanding tasks." *Id*. at ¶ 14.

"Further, the risk of error during operating system upgrades was significant, frequently resulting in faulty installations that slowed down mainframe computer functioning." D.I. 28 at ¶ 15. "Mainframe computer operating systems could suffer a number of problems, such as

4

incompatibility between the mainframe (or its components) and the code of the operating system. Errors also frequently resulted from modifications to the mainframe operating system. The addition of new or different modules to the operating system could create undesirable results or errors, slowing and otherwise inhibiting its performance." *Id*. ¶ 16.

"The inventions claimed in the '737 Patent addressed these technical problems with a method for upgrading mainframe computer systems that employed a number of inventive concepts." D.I. 28 at ¶ 17. "One of the inventive and unconventional aspects of the '737 Patent is reflected in the 'using the client computer system to automatically customize said base operating system' step of Claim 1, employing a distributed architecture in which the client computer system prepares the base operating system after receiving the 'configuration' of the 'mainframe computer system.'" *Id*., ¶ 18.

"For example, Claim 1 of the '737 Patent employed a distributed architecture 'using a client computer system to generate a base operating system' and 'using the client computer system to automatically customize said base operating system' remote from the 'mainframe computer system over a communication network.'" D.I. 28 at ¶ 19. "As explained in the '737 Patent, '[t]he present invention preferably queries the existing mainframe computer system 2 for a plurality of parameters that are directed to the way the mainframe computer system 2 is configured. For example, the number of volumes and partitions installed on the mainframe computer system 2 is preferably retrieved and stored in a database for use during the upgrade. The information gathering component of the present invention uses the information to mimic the existing mainframe computer system 2 environment, and, further, to configure the mainframe computer system 2 that is receiving the upgrade for optimal performance.'" *Id*., ¶ 20 (quoting D.I. 28-1, 4:48-59).

"Thus, as claimed in the 'automatically receiving source profile information' step of Claim 1 of the '737 Patent, the system 'the present invention performs "discovery" on the

mainframe computer system in order to receive profile information of the configuration of the mainframe computer system.'" D.I. 28 at ¶ 21 (quoting D.I. 28-1, 2:30-31).

"Mimicking the mainframe computer system environment on the client computer allowed, among other things, the client computer to configure and test the operating system remotely. This, in turn, allowed the client computer to test the functionality of the operating system, make necessary improvements, and resolve errors before such a system was fully loaded onto the mainframe computer system." D.I. 28 at ¶ 22.

"For example, Claim 6 teaches 'repeating [the] execution of said step of customizing said base operating system after said step of evaluating determines existence of an error,' in order to detect and avoid errors in an operating system before installing it on a mainframe." D.I. 28 at ¶ 23. Further, Claim 1's steps of 'automatically receiving source profile information…representing an existing configuration' of the mainframe computer system, and 'using the client computer system to automatically customize said base operating system' enabled enhancements to mainframe operating systems that were not possible using the conventional method of installation." *Id*., ¶ 24. "Utilizing the method of Claim 1 allowed mainframe operating systems to be customized to maximize the efficiency of particular mainframes, minimize the amount of storage space required to hold the operating system, and thereby improved the functionality of the mainframes themselves." *Id*.

"Further, by off-loading the generation, configuration, customization and testing of mainframe operating systems to the client computer, the computing power of mainframe computer systems was not 'lost' on these activities but could be efficiently delegated to the client computer." D.I. 28 at ¶ 25.  "As explained in the '737 Patent, '[a]s changes are made to the environment in the mainframe computer system 2, the otherwise disjointed components that contribute to the overall system are automatically combined, thereby maintaining seamless operations for upgrading the mainframe computer system 2.'" *Id*., ¶ 26 (quoting D.I. 28-1, 12:27-32). "The data are 'stored in a discovery database and used to quickly and efficiently configure

the environment for the mainframe computer system 2 receiving the upgraded operating system.'" *Id*., ¶ 27 (quoting D.I. 28-1, 6:32-37).

"'[U]sing a client computer system to generate a base operating system,' as claimed in Claim 1, also freed the mainframe computer for the performance of other tasks in the meantime. This approach was highly unconventional compared to the prior art method of performing the upgrade entirely on the mainframe computer, often tying up the mainframe for "three to four days." D.I. 28 at ¶ 28 (quoting D.I. 28-1, 1:43-44). As the '737 Patent explains, "*[a]bsent* the steps and processes described herein, a skilled mainframe computer systems programmer is required to enable a mainframe computer system 2, using ***just*** the base operating system, to successfully IPL the mainframe computer system." D.I. 28-1 at 5:12-15 (emphasis added). Thus, according to the '737 Patent itself, the claimed methods use more than "just" the "base operating system." *Id*.

In sum, "[u]sing the architecture claimed in Claim 1 of the '737 Patent was not well-understood, routine or conventional, but was an unconventional and inventive approach that improved the functioning of mainframe computer systems and their operating systems." *Id*., ¶ 30.

## II. ARGUMENT

### A. Micro Focus's Motion is Premature, and Raises Disputed Issues of Fact That Preclude Resolution of Section 101 Issues at the Pleading Stage

The analysis of patent-eligibility under 35 U.S.C. § 101 involves "question[s] of fact," such as "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field." *Berkheimer v. HP Inc*., 881 F.3d 1360, 1368 (Fed. Cir. 2018). Thus, "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to "defeat[] a motion to dismiss." *Cellspin Soft, Inc. v. Fitbit, Inc*., 927 F.3d 1306, 1317 (Fed. Cir. 2019) (stating that "factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101," and noting that "[w]e have no basis, at the pleadings stage, to say that these claimed techniques, among others, were well-known or conventional as a matter of law"); *see also Aatrix Software, Inc. v.*

7

*Green Shades Software, Inc.*, 882 F.3d 1121, 1126–27 (Fed. Cir. 2018) (finding factual allegations of patentee's complaint sufficient to survive a motion to dismiss and stating that "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)"). Therefore, where a disputed issue of fact relevant to the analysis of patent-eligibility under Section 101 exists, eligibility may not be resolved at the pleading stage.

      Many courts have found that "the issue" of eligibility under Section 101 "is inherently ill suited to adjudication at the pleading stage, particularly when the dispute turns on whether the claims are impermissibly abstract," as here. *Ubiquitous Connectivity, LP v. Cent. Sec. Grp. - Nationwide, Inc.*, No. 18-CV-368-JED-CDL, 2021 WL 1970664, at *3–4 (N.D. Okla. May 17, 2021). "'Determining patent eligibility requires a full understanding of the basic character of the claimed subject matter'…but the two tools mostly likely to aid the court in developing such an understanding—claim construction and the presentation of expert testimony—will not ordinarily have occurred at the dismissal stage." *Id*. (quoting *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019)). Further, the "*Alice* test is notoriously difficult to apply, even in the best of circumstances. In a recent survey of judges who frequently handle patent cases, respondents rated eligibility under § 101 to be the most difficult issue of patent validity and the area of patent law with the least doctrinal clarity." *Id.* (citing Matthew G. Sipe, *Patent Law 101: The view from the Bench*, 88 Geo. Wash. L. Rev. Arguendo 21, 29 (2020)). "When this task is undertaken at the pleading stage, where a court cannot benefit from the claim construction process and a developed factual record, accuracy will be the exception rather than the rule." *Id*. Indeed, "[r]esolving validity issues at the Rule 12 stage can also tempt courts, sometimes improperly, to conclude that certain concepts are conventional or routine by way of judicial notice." *Intellectual Ventures II LLC v. FedEx Corp.*, 2017 WL 6002762, at *2 n. 1 (E.D. Tex. 2017).

      For these reasons, many courts have found "it is wiser and more efficient to wait to determine a patent's § 101 eligibility until after fact discovery has opened" and "after issuing its

claim construction order." *Slyce Acquisition Inc. v. Syte - Visual Conception Ltd.*, No. W-19-CV-257, 2020 WL 278481, *3–7 (W.D. Tex. Jan. 10, 2020) (noting, *inter alia*, that "a Rule 12(b) motion to dismiss is a procedurally awkward place for a court resolve a patent's § 101 eligibility"); *see also e-Numerate Sols., Inc. v. United States*, 149 Fed. Cl. 563, 577–79 (2020) (accord).

Here, claim construction and fact discovery are in their early stages. A Markman Hearing is set for June 26, 2024, and fact discovery does not close until January 2, 2025. *See* D.I. 32. At this time, the Court does not have the benefit of a fuller understanding of the '737 Patent or a developed factual record, making a Section 101 analysis premature at this stage. Given that the Markman Hearing is six (6) months away, it makes eminent sense to defer Section 101 issues until after the Court has issued its claim construction order, particularly since "the cost for both parties of delaying the resolution of § 101 eligibility until after claim construction is relatively modest and limited to the cost of preparing the claim construction briefing and preparing for the Markman hearing." *Slyce Acquisition*, 2020 WL 278481, at *8 n.3.

Regardless, as argued herein, the factual allegations of Plaintiff's FAC—largely ignored by Micro Focus—preclude resolution of Section 101 at the pleading stage in any event.

### B. Claim 1 is Not Directed to an Abstract Idea

Micro Focus argues that the '737 Patent is directed to the "abstract idea of automatically upgrading an operating system by receiving, transferring, and using information." D.I. 33 at 7. In so arguing, Micro Focus oversimplifies the claims and misstates the law of patent-eligibility.

Micro Focus asserts that "[b]inding precedent has uniformly found that 'automation'" is "itself an abstract idea," as if that were the end of the inquiry. D.I. 33 at 8. However, there is no bright-line rule that any claim involving automation is necessarily directed to an "abstract idea." Rather, the Federal Circuit has cautioned that "[a]s to the abstract idea exception, no single, hard-and-fast rule that automatically outputs an answer in all contexts exists." *In re Killian*, 45 F.4th 1373, 1381–82 (Fed. Cir. 2022). More importantly, Micro Focus ignores the Federal Circuit's

9

statement that "[a]utomation of a manual process may **not** be an abstract idea if the automated process differs from the manual process and provides a specific means or method that improves the relevant technology." *People.ai, Inc.*, 2023 WL 2820794, at *8 (emphasis added).

As the Federal Circuit has explained, "[i]n *McRO*, we held that using unconventional rules in the ordered combination of claimed steps of patents related to 'automating part of a preexisting 3–D animation method' were not directed to an abstract idea at *Alice/Mayo* step one." *People.ai,* 2023 WL 2820794, at *8 (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1302-03 (Fed. Cir. 2016)). "The fact that the steps employed by the claims in *McRO* differed from those previously employed in the manual process was critical to our conclusion." *Id*. Indeed, in *McRO* the Federal Circuit upheld the eligibility of a "a distinct process to automate a task previously performed by humans." *McRO,* 837 F.3d at 1314.

Likewise, Micro Focus misleadingly suggests that "gathering and analyzing information" are abstract ideas *per se*. D.I. 33 at 7-8. Once again, precedent is more nuanced than Micro Focus wishes to acknowledge. What the Federal Circuit has actually held is that "gathering and analyzing information of a specified content, then displaying the results without any particular assertedly inventive technology for performing those functions is an abstract idea." *In re Killian*, 45 F.4th 1373, 1382 (Fed. Cir. 2022). Thus, where there is inventive technology for performing such functions, they cease to be abstract. And "an inventive concept can be found" even "in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

Micro Focus places significant weight on *Tranxition, Inc. v. Lenovo (U.S.) Inc.*, 664 F. App'x 968, 971-72 (Fed. Cir. 2016), and attempts to draw various parallels between that case and this one. But the decision in *Tranxition* turned on the fact that "[t]here [was] nothing in the claim to suggest that, once settings have been transitioned, the target computer will be any more efficient." *Tranxition,* 664 F. App'x at 971–72. Here, however, unlike *Tranxition*, Plaintiff has specifically pleaded that the mainframe to be upgraded ***will*** be more efficient as a result of the

10

claimed method. Plaintiff specifically alleges that "[u]tilizing the method of Claim 1 allowed mainframe operating systems to be customized to **maximize the efficiency of particular mainframes**, minimize the amount of storage space required to hold the operating system, and thereby improved the functionality of the mainframes themselves." D.I. 28 at ¶ 24.

Further, employing the distributed architecture of the '737 Patent to perform the upgrades such that the "the client computer [was able] to configure and test the operating system remotely," allowed it to "test the functionality of the operating system, make necessary improvements, and resolve errors before such a system was fully loaded onto the mainframe." D.I. 28 at ¶ 22. Prior to the claimed method, "[e]rrors" "frequently resulted from modifications to the mainframe operating system" and the "addition of new or different modules to the operating system could create undesirable results or errors, slowing and otherwise inhibiting its performance." *Id*. at ¶ 16. Configuring the upgrade on a client computer also "freed the mainframe computer for the performance of other tasks in the meantime." *Id*. at ¶¶ 28, 25.

Moreover, in *Tranxition* there was no evidence that the claimed process differed from the previously manual process it automated.[1] Here, by contrast, there are fundamental differences

---

[1] Micro Focus points out that the court in *Tranxition* stated, in dictum, that "it is not relevant that a human may perform a task differently from a computer," a point that might superficially seem to be at odds with the Federal Circuit's statement in *People.ai* that "[a]utomation of a manual process may not be an abstract idea if the automated process differs from the manual process and provides a specific means or method that improves the relevant technology." *Compare Tranxition*, 664 F. App'x at 972, *with People.ai*, 2023 WL 2820794, at *8. However, *Tranxition* is non-precedential, and its somewhat overbroad dictum is refuted at a deeper level by the precedential Federal Circuit cases cited in *People.ai*, 2023 WL 2820794, at *8—namely, by *McRO* and *FairWarning*. As the Federal Circuit emphasized there, the important point is not necessarily the difference between a human process and a computer process, but rather between a conventional process and an unconventional one. *See, e.g., McRO*, 837 F.3d at 1302-1303 ("We hold that the ordered combination of claimed steps, using **unconventional** rules that relate sub-sequences of phonemes, timings, and morph weight sets, is not directed to an abstract idea and is therefore patent-eligible subject matter under § 101.") (emphasis added); *see also FairWarning IP, LLC v. Iatric Sys., Inc*., 839 F.3d 1089, 1094 (Fed. Cir. 2016) (explaining that "the **traditional** process and newly claimed method [at issue in *McRO*] stood in contrast: while both produced a similar result, i.e., realistic animations of facial movements accompanying speech, the two practices produced those results in fundamentally different ways") (emphasis added).

11

between the prior methods of upgrading mainframes and those claimed in the '737 Patent. For example, as already indicated, Claim 1 of the '737 Patent employs a distributed architecture using a client computer system to generate and customize a base operating system, which allowed greater customization and prevented error. D.I. 28 at ¶¶ 11-30. Moreover, as the specification of '737 Patent explains, using the claimed method "*[a]bsent* the steps and processes described herein, a skilled mainframe computer systems programmer is required to enable a mainframe computer system 2, using *just* the base operating system, to successfully IPL the mainframe computer system." D.I. 28-1 at 5:12-15 (emphasis added). Thus, without the invention claimed in the '737 Patent, the human programmer was limited to performing the upgrade using the base operating system alone.

By contrast, according to the method of Claim 1, "source profile information" representing a configuration of the mainframe is received (e.g., "the number of volumes and partitions installed on the mainframe computer system 2 is preferably retrieved and stored in a database for use during the upgrade" so as to "mimic the existing mainframe computer system environment," D.I. 28-1 at 4:52-57. The claimed method allowed the client computer to "recreate the environment settings of the existing system" of the mainframe. *Id.*, Abstract. This, in turn, allowed for testing, detection and avoidance of error prior to installation of the operating system. D.I. 28 at ¶¶ 15-16, 22-23. Moreover, the client computer is used to "customize" the base operating system "to incorporate elements" in the "source profile information." This allowed "operating systems to be customized to maximize the efficiency of particular mainframes." *Id*. ¶ 24.

The significant differences between the claimed method, and the conventional process previously performed by human beings, further distinguish this case from *Tranxition* and the other cases relied on by Micro Focus, and confirm that the '737 Patent is directed to a patent-eligible invention. At a minimum, there is a factual dispute regarding whether the method claimed in the '737 Patent maximizes the "efficiency" of particular mainframes, and is a specific

method that improves the relevant technology, versus a mere abstract idea. *People.ai, Inc.*, 2023 WL 2820794, at *8; *McRO,* 837 F.3d at 1314; D.I. 28 at ¶¶ 15-16, 22-24.

Accordingly, Micro Focus's Motion should be denied for these reasons alone.

### C. The '737 Patent Claims Inventive Concepts

At Step Two of the Section 101 analysis, Micro Focus argues that the allegations of Plaintiff's FAC are somehow "preclude[d]" by the '737 Patent's references to automation. D.I. 33 at 13. Micro Focus also asserts that the '737 Patent "concedes" that the "claims recite directives 'typically' performed by people." *Id.*

On the contrary, the '737 Patent explicitly contrasts the claimed method with the process previously performed by human beings. As already mentioned, the '737 Patent states that "**[a]bsent** the steps and processes described herein, a skilled mainframe computer systems programmer is required to enable a mainframe computer system 2, using **just** the base operating system, to successfully IPL the mainframe computer system." D.I. 28-1 at 5:12-15 (emphasis added). In other words, the steps and processes described and claimed in the '737 Patent entail *more* than "just" using the base operating system to perform an upgrade—and cannot be boiled down to the "directives typically performed by people" as Micro Focus contends. The invention does more than this. For example, as explained in the Abstract, the invention uses information "to recreate the environment settings of the existing system, **and** provide[s] a series of directives typically required of a skilled mainframe computer systems programmer." D.I. 28-1, Abstract (emphasis added). Moreover, the use of a client computer in Claim 1 to customize the base operating system prior to installation on the mainframe is explicitly not a "directive typically performed by people," since the '737 Patent teaches that "absent" its claimed "steps and processes," the human programmer would use only the base operating system directly on the mainframe—not the client computer as claimed in Claim 1. D.I. 28-1 at 5:12-15. Thus, none of Plaintiff's allegations are contradicted by the '737 Patent, and Micro Focus's attempt to oversimplify the claimed method should be rejected.

Micro Focus tries to cast aspersions on Plaintiff's allegation that the '737 Patent reduces the risk of error or other undesirable results from the addition of new or different modules to the operating system. Micro Focus argues that "Plaintiff's allegations of speed and accuracy improvements all stem from automation." D.I. 33 at 15. According to Micro Focus, this "just confirms that the '737 [p]atent is a quintessential 'do it on a computer' patent." D.I. 33 at 14. But Micro Focus misses the point—the inventive concept involves not just using a computer to perform the upgrade, but using a ***client*** computer to gather information about the configuration of the mainframe and then mimick the environment of the mainframe on the client so that the functionality of the operating system could be tested, improved, and customized (and errors could be resolved) before the operating system was installed on the mainframe. D.I. 28 at ¶ 22. Thus, when Micro Focus argues that the improvements "all stem from automation," it ignores the distributed architecture of the '737 Patent, which goes beyond mere "automation."

The Federal Circuit has found that the "use of distributed architecture" has provided an inventive concept. For example, in *Amdocs*, the Federal Circuit found an inventive concept in a "distributed architecture" that solved a "particular technological problem," i.e., "reduced data flows and the possibility of smaller databases." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301-1302 (Fed. Cir. 2016). Similarly, in *BASCOM*, the Federal Circuit found an "inventive concept" in the "non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM,* 827 F.3d at 1350. There, the inventive concept was the "installation of a filtering tool at a specific location, remote from end-users, with customizable filtering features specific to each end user"—a "design [that] gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server." *Id*.

Here, "[o]ne of the inventive and unconventional aspects of the '737 Patent is reflected in the 'using the client computer system to automatically customize said base operating system' step of Claim 1, employing a distributed architecture in which the client computer system prepares the base operating system after receiving the 'configuration' of the 'mainframe

computer system.'" D.I. 28 at ¶ 18. Like the distributed architecture in *Amdocs* and *BASCOM*, the use of a distributed architecture in the '737 Patent solves a particular technological problem—here, the risk of error—by allowing the operating system to be tested on the client computer that mimics the configuration of the mainframe before being uploaded to the mainframe itself. *Id*. at ¶ 22. The Federal Circuit has recognized "error" as a technological problem whose solution is a sign of inventiveness. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1348 (Fed. Cir. 2017) (holding patent eligible under Section 101 and noting that "the claims here result in a system that reduces errors in an inertial system that tracks an object on a moving platform.").

Accordingly, because the FAC has sufficiently alleged that the '737 Patent contains inventive concepts that were not well-understood, routine, or conventional at the time of invention, the Court must deny Micro Focus's Motion to Dismiss. At a minimum, Micro Focus raises factual disputes with the allegations of Plaintiff's FAC, and what the specification of the '737 Patent discloses to a skilled artisan, which cannot be resolved at the pleading stage.

### III.    CONCLUSION

Accordingly, Plaintiff requests that Micro Focus's Motion be **DENIED** in its entirety. Alternatively, if the Court is inclined to grant Micro Focus's Motion in any respect, Plaintiff would ask that any such dismissal be *without* prejudice and with leave to amend.

Dated: January 8, 2024                                          Respectfully submitted,

/s/ Isaac Rabicoff
Isaac Rabicoff
Rabicoff Law LLC
4311 N Ravenswood Ave Suite 315
Chicago, IL 60613
7736694590
isaac@rabilaw.com

**Counsel for Plaintiff**
**FrameTech LLC**

15

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2024, I electronically filed the above documents with the Clerk of Court using CM/ECF which will send electronic notification of such filings to all registered counsel.

/s/ *Isaac Rabicoff*
Isaac Rabicoff